# The Evangelical Association's Appeal.
# The Charitable Society of the Evangelical Association's Appeal.

An unincorporated religious society being capable of taking a charitable bequest, a subordinate corporation erected for the purpose of creating and establishing a fund for the relief and support of its itinerant, superannuated, and worn-out ministers and preachers, cannot claim a legacy evidently intended for the society at large; for a gift to the latter is not in ease of the former.

A charitable bequest to an unincorporated religious society is not invalid, by reason of its being composed, to a great extent, of persons not resident within the state.

Nor is such bequest void, because given simply to an unincorporated association, and not upon any defined charity, or for any specified charitable use.

Where executors file separate accounts, it is erroneous to decree a joint distribution.

APPEALS from the Orphans' Court of *Lehigh county*.

These were two appeals from the decree of the court below upon the accounts of Peter Horrace and David Mertz, executors of Frederick Miller, deceased, the one by The Charitable Society of the Evangelical Association, a society incorporated by the state of Pennsylvania, and the other by The Evangelical Association, an unincorporated religious society.

Frederick Miller died on the 24th January 1854, having first made and published his last will and testament, as follows:—

"In the name of God, amen. I, Frederick Miller, of the township of Washington, Lehigh county, Pennsylvania, farmer; I, being weak in body, but of sound mind and memory and understanding, but considering the uncertainty of this transitory life, do make and publish this my last will and testament, in manner and form following, to wit:

"First. I direct that my body be decently interred, according to the rites and ceremonies of a Christian, and that my funeral be conducted in manner corresponding with my estate and situation in life.

"Second. It is my will, and I do order that all my just debts and funeral expenses be duly paid and satisfied, as soon as conveniently can be, after my decease, and as to such worldly estate as it hath pleased God to intrust me with, I dispose of the same, as follows:

"Third. I do order and direct that in two years after my death, I bequeath four thousand dollars, which shall be paid to the 'Evangelical Community or Association.' (I think they are incorporated.)

[The Evangelical Association's Appeal.]

"Fourth. I do order and direct that in one year thereafter, I bequeath two thousand dollars ($2000) to the Common Free School of the district of Washington township and Heidelberg township, in Lehigh county, to wit, twelve hundred dollars to the district of Washington township, and eight hundred dollars to the district of Heidelberg, and two thousand dollars to the said 'Evangelical Communion or Association.'

"Fifth. And in one year thereafter, I bequeath two thousand dollars to the said 'Evangelical Communion or Association,' and two thousand dollars to the common free schools of said Washington and Heidelberg districts, to wit, to the district of Washington twelve hundred dollars, to the district of Heidelberg township eight hundred dollars.

"Sixth. I bequeath in one year thereafter, two thousand dollars to the heirs of my two brothers, George and John, or to their heirs or assigns, and also two thousand dollars to the said 'Evangelical Communion or Association.'

"Seventh. In one year thereafter, I bequeath two hundred dollars to Sally Martin, my present housekeeper, two hundred dollars to Susan Roth, intermarried with Peter Horrace, and also two thousand dollars to the 'Evangelical Communion or Association' aforesaid, and sixteen hundred dollars to my two brothers, George and John, or their heirs or assigns, to share and share alike between said George and John, or their heirs or assigns.

"Eighth. And I do further bequeath that two thousand dollars snall be paid to the aforesaid 'Evangelical Communion or Association,' and two thousand to the heirs of my two brothers George and John, or to their heirs or assigns, to share and share alike, each and every year thereafter, until all my real and personal property be distributed as herein mentioned.

"Lastly. I nominate, constitute, and appoint Hugh O. Wilson, David Mertz, and Peter Horrace to be my executors of this my last will, and they shall dispose of all my real and personal estate, either by private or public sale, to the best advantage, and for their services they shall have six per cent. for all moneys received and paid over to those legally authorized, and I do hereby revoke all other wills, and declaring this my last will and testament.

"In witness whereof, I have hereunto set my hand and seal, this seventeenth day (17th) of January, one thousand eight hundred and fifty-four (1854.)"

The testator, in his lifetime, was a member of the "Evangelical Association," an unincorporated religious society, commonly known as the "Albright People," or German Methodists, composed of about 30,000 members, embracing congregations not only in this Commonwealth, but in Ohio, and other of the western states, and in Canada. It is an organized Christian denomination, holding a defined system of doctrine, united in quarterly, annual, and gene-

ral conferences, and governed by a certain prescribed discipline, and by the rules of order adopted, from time to time, by the legislative power of the association.

The Charitable Society of the Evangelical Association is a corporation chartered by the state of Pennsylvania, for the purpose of creating and establishing a fund for the relief and support of itinerant, superannuated, and worn-out ministers and preachers of the "Evangelical Association" in the United States of America, their wives and children, widows and orphans.

David Mertz and Peter Horrace filed their separate accounts as executors of Frederick Miller, deceased, on the 30th June 1855, exhibiting a balance in the hands of David Mertz of $3974.47, and in the hands of Peter Horrace of $1573.96.

The auditor appointed to report distribution of the funds in the hands of the executors, blended the separate accounts, and reported a joint distribution among the school districts and the heirs at law of the testator; and rejected the claims both of the "Evangelical Association" and of the "Charitable Society of the Evangelical Society," as legatees under the will. And his report having been confirmed by the court, and distribution decreed accordingly, these appeals were taken.

*J. D. Stiles* and *H. C. Longnecker*, for the appellants, cited *Appendix to* 4 *Wheat.* 3; 2 *Bl. Com.* 270–1; 4 *Reeves* 237; Vidal *v.* Girard's Executors, 2 *How.* 144; *Crabb's E. L.* 504; Stat. 43 Eliz. c. 4, 2 *Ruff.* 708; 5 *Hume's Hist.* 617–87; 3 *Rapin* 225–6; 2 *Mer.* 143; Witman *v.* Lex, 17 *S. & R.* 91; Baptist Association *v.* Hart, 4 *Wheat.* 49; Dartmouth College *v.* Woodward, *Id.* 518; Zane's Will, *Brightly* 408; Leazure *v.* Hillegas, 7 *S. & R.* 321; Methodist Church *v.* Remington, 1 *Watts* 224; McGirr *v.* Aaron, 1 *Penn. R.* 51; Domestic and Foreign Missionary Society's Appeal, 6 *Casey* 425; Thomas *v.* Ellmaker, 1 *Pars.* 98; Babb *v.* Reed, 5 *Rawle* 151; Price *v.* Maxwell, 4 *Casey* 23; Cresson's Appeal, 6 *Id.* 437; Cresson *v.* Cresson, 6 *Am. L. R.* 46; Inglis *v.* Trustees of the Sailor's Snug Harbour, 3 *Pet.* 138; Pickering *v.* Shotwell, 10 *Barr* 26; Zimmerman *v.* Anders, 6 *W. & S.* 220; Philadelphia *v.* Elliott, 3 *Rawle* 170; Terrett *v.* Taylor, 9 *Cranch* 45; Kirk *v.* King, 3 *Barr* 439; Caufman *v.* Presbyterian Congregation of Cedar Spring, 6 *Binn.* 62, 66; McConnell *v.* Town of Lexington, 12 *Wheat.* 582; Mather *v.* Trinity Church, 3 *S. & R.* 510; Ex parte Cassel and Spayd, 3 *Watts* 440; Martin *v.* McCord, 5 *Watts* 493; Beaver *v.* Filson, 8 *Barr* 334; Newell's Appeal, 12 *Harris* 197; Morrison *v.* Beirer, 2 *W. & S.* 86; Fontain *v.* Ravenel, 17 *How.* 396; Congregation *v.* Johnston, 1 *W. & S.* 25; Unangst *v.* Shortz, 5 *Wh.* 506; Means *v.* Presbyterian Church, 3 *W. & S.* 303; Skilton *v.* Webster, *Brightly* 203; Phillips *v.* Jones, 10 *Leg. Int.* 110.

[The Evangelical Association's Appeal.]

*Reeder & Green* and *C. M. Runk*, for the appellees, cited
Methodist Church *v.* Remington, 1 *Watts* 218; Price *v.* Maxwell,
4 *Casey* 23; Hillyard *v.* Miller, 10 *Barr* 326; Witman *v.* Lex, 17
*S. & R.* 91; *Shelford on Mortmain* 85; Vesey *v.* Jamson, 1 *Sim.
& Stu.* 69; Morice *v.* Bishop of Durham, 9 *Ves.* 406; s. c. 10
*Id.* 521; 2 *Story's Eq. Jur.*, § 1183; Zimmerman *v.* Anders, 6
*W. & S.* 220; The Domestic and Foreign Missionary Society's
Appeal, 6 *Casey* 435.

The opinion of the court was delivered by

STRONG, J.—Both these appeals involve the same questions, and
they have been argued together. Whatever may be the merits
of that taken by "The Evangelical Association," it is clear, that
the appeal of "The Charitable Society of the Evangelical Associa-
tion" ought not to prevail. The appellants do not answer the
description of the legatees given in the will of the testator, while
"The Evangelical Association" does. The bequests are to "The
Evangelical Communion *or* Association," and the report of the
auditor establishes that there is in being an organized body known
as "The Evangelical Association." The latter answers fully the
description of the testator, and is entitled to the legacies, if it is
capable of taking them. It is true, that in cases of charitable
gifts, the substance of the gift is regarded, and when the object
designated by the donor is incapable of taking directly, the law
assures the gift to a superior party which is capable, if the gift
be intended in ease of that party. But unincorporated religious
societies are capable of taking legacies, and "The Charitable
Society of the Evangelical Association," though a corporation,
and capable of taking, is not the superior of The Evangelical
Association, but subordinate to it. A gift to the latter is not in
ease of the former. Upon no recognised principle, therefore, can
we hold that The Charitable Society of the Evangelical Associa-
tion is a legitimate claimant to the fund for distribution.

Are the legacies, then, available in favour of The Evangelical
Association? That is established by the proofs, and found by the
auditor, to be an unincorporated religious society, composed of
about thirty thousand members, residing at various places in this
state, in other states, and in Canada, who hold to a defined system
of faith, who are united in quarterly, annual, and general con-
ferences, and who are governed by a certain prescribed discipline,
and by rules of order adopted from time to time by the legislative
power of the association. Its organization is as complete, as
minute as that of any existing religious society in the country.
And it is strictly and exclusively a religious association, existing
only for religious purposes. If it cannot take the legacies given
by the will of Frederick Miller, it is not because it is incapable
of taking any legacy, for nothing is better settled than that reli-

gious societies, whether incorporated or not, have capacity to take and hold charitable bequests.

It is contended, however, that the bequests in this will to the association are invalid, because the society is composed largely of persons not resident within the state of Pennsylvania, and in support of this position reliance is placed upon Methodist Church *v.* Remington, 1 *Watts* 218. Such is clearly not the rule in England respecting charitable bequests to foreigners: 1 *Bro. Ch.* 274–444, 571; 14 *Vesey* 539; 16 *Id.* 337; and the doctrine of that case has not been adhered to in this state. In Spear *v.* Bruce, argued at Pittsburgh in 1843, this court sustained a devise of land " to the Synod of the Secession Church," " the proceeds to be applied to the spreading of the gospel here and elsewhere, and for the support of pious young men preparing for the ministry," which land the executors were directed to sell for that purpose. And this testamentary disposition was sustained, though the synod was not incorporated, and though it represented a denomination of Christians whose members were scattered throughout the United States and British North America. Again, in Thompson *v.* Swoope, 12 *Harris* 474, where The Methodist Church *v.* Remington was reviewed, it was held, that " the law does not require that charities and charitable institutions, in order to be entitled to its sanction and protection, shall be limited in their sphere of operation by the lines of the state." That the donees were not resident in this state was there held to be immaterial. The principles regulating gifts in charity must be the same, no matter what may be the residence of the donee, and as it is one of those principles, that an unincorporated religious society may take, it can make no difference that some of the ultimate objects are without the state limits.

It is next urged, that the bequests are void, because they are made to an unincorporated association, and not upon any defined charity, or for any specified charitable use. It is admitted, that if they were made to a corporate body, the absence of any designation of a charitable use might be immaterial, but it is contended, that the appellants, being unincorporated, cannot take, because it is denied that the bequests are charitable. They are to " The Evangelical Communion or Association," and there is no expression of the purpose for which they are given. We are told, that no cases are to be found, in which gifts have been held to be charitable, where the donee only was named, without any designation of an use other than to such donee. That this is a mistake we shall presently see. It may be well, however, first to notice the character of the donees in the present case. They are a religious society, as has been seen. The purposes of their organization are all such as the law denominates charitable. Under their present mode of existence, they have no power to devote property

given to them to any other than charitable uses.   This is the pre-
scription of their discipline and rules of order, and to such uses all
the funds of the association must be devoted.   It is impossible
that while they continue The Evangelical Association, their pro-
perty can be expended for any other uses and purposes than those
pointed out in their articles of union.   Why, then, is not a gift to
them a charitable gift?   No one can doubt that the design of the
testator was to consecrate his bounty to the uses which the asso-
ciation has in view.   His intent is as plainly manifested, as it
would have been, if he had expressly declared, that the legacies
should be applied to the very uses for which the association was
created, and for which it exists.   We are not to be astute in de-
feating his benevolent purpose.   It has been said, indeed, by an
eminent text writer, 1 *Jarman on Wills* 193, that "a gift will not
be deemed charitable merely from the nature of the professional
character of the devisee, or on account of the testator's having
accompanied the gift with an expression of his expectation that
the devisee would discharge the duties incidental to such a charac-
ter, however intimately those duties may concern the welfare of
others, as this merely denotes the motive of the gift, and not that
the devisee is to take otherwise than beneficially."   The only case
cited for this doctrine is Doe on the demise of Phillips *v.* Aldridge,
4 *T. R.* 264.   There the devise was to a natural person described
by name.   He was also described as "now preacher at the meeting-
house at Lyndhurst."   Then followed an expression of the testa-
tor's expectation, that the devisee would "without delay, settle and
forward everything in his power, to promote and carry on the work
of God at Lyndhurst."   This was held, and necessarily so, not
to be a devise in charity, but to be beneficial to the devisee.   This
is very far from maintaining the position generally, that a devise
will not be held charitable merely from the nature of the profes-
sional character of the devisee.   However true this may be, where
the devisee is a natural person, and where, consequently, he has
interests of his own, distinct from those which appertain to him
as a professional man, the reason for it altogether fails, when the
donee is an artificial being, having but one character, and that
charitable.   In the noted case of Morice *v.* The Bishop of Dur-
ham, 9 *Vesey* 408, and 10 *Vesey* 532, where the gift was held not
to be charitable, there was a trust declared.   It was not there a
question whether the bishop took beneficially, or whether he took
in trust.   He was the executor of the will, and disclaimed taking
beneficially.   But the trust having been to dispose of the bequest
for *objects of benevolence and liberality*, the question was whether
such objects were necessarily charities.   It was held, that they
were not, and therefore the trust was decreed to be too indefinite.
Had "objects of benevolence and liberality" been necessarily
objects of charity, the trust would have been enforced.   Whether

in this state it would have been held valid, need not now be considered. In Witman *v.* Lex, 17 *S. & R.* 88, it was said, that it probably would. But at all events, the case furnishes no support to Mr. Jarman's position. In the case The Society for the Propagation of the Gospel in Foreign Parts *v.* The Attorney-General, 3 *Russ.* 142, it was held, that when a pecuniary legacy is bequeathed absolutely to a corporation existing only for charitable purposes, the court will decree payment without requiring that a scheme be settled by the master for its distribution; and in Well Beloved *v.* Jones, 1 *Sim. & Stu.* 43, a legacy was held valid as a charity, given to the treasurer of an unincorporated charitable institution, *to become part of the general funds of that institution.* Of the same class are all the numerous gifts to the general funds of a religious or charitable association, which have been sustained as charities, without any other expression of the donor's intent. Thus, in Magill *v.* Brown, *Brightly* 347, numerous bequests were ruled to be valid, made to Friends, composing different Yearly Meetings, to be paid into the Yearly Meeting stock. There was no other designation of a charitable use than was to be found in the character of the legatees, who were unincorporated religious societies. The legacies were given without any direction as to their disposition, except that they were to become a part of the general property of the societies. So in Blenon's Estate, *Brightly* 339, unincorporated charitable institutions took legacies given to them without any direction that the gifts should be expended for charitable purposes. Their own character determined the character of the gift. In Price *v.* Maxwell, 4 *Casey* 23, a gift to the West Town Boarding School was held a charity, solely because the donees were a charitable association. As to a part of the gift, there was no designation of an use. See also Burr *v.* Smith, 7 *Vermont* 241. Great numbers of cases might be cited, in which gifts to associations whose objects were exclusively charitable, have been sustained as charities, though the direction was to pay into the general funds of the associations, and though there was no express requirement that the donor's bounty should be applied to any other uses.

We are of opinion, therefore, that the legacies given by the will of Frederick Miller to The Evangelical Communion or Association are valid, and that The Evangelical Association is entitled to them in the distribution. The decree of the Orphans' Court must be reversed.

The joint distribution was also erroneous. It will of course be corrected in the court below.

> The decree of the Orphans' Court is reversed, and the record is remitted, with instructions to order a distribution according to the principles indicated in this opinion.